The first case for argument this morning is 18-2133, Merck v. Wyeth. Mr. Lankin, good morning. Good morning, and may it please the Court. Wyeth claims to have invented a formulation that stabilizes polysaccharide protein conjugates to prevent aggregation, clumping, that's caused by silicon oil. But the prior art, like Chiron and Elan, taught the same formulation with the same ingredients to stabilize the same thing, polysaccharide protein conjugates, in the same way. Claim 1 was thus obvious. It claimed the same formulation to stabilize any polysaccharide protein conjugate. Claim 17 was also obvious. It recited the same formulation. Yeah, but the big difference is the numbers, right? And your claim, Claim 18, that's in dispute, has 13. So the Board rested on that difference. That's right. The one thing that can't make a difference is the number of pallet polysaccharide conjugates because it's the protein, the Board made this clear, it's the protein that causes the aggregation. This formulation acts on the protein, so adding additional polysaccharides, additional serotypes, isn't going to make that formulation cease to work. That doesn't seem to me to be an answer to the question, because there's a question of whether there was a motivation to combine the 13. It may have been that the methodology for combining the 13 was obvious, and probably it was. But where's the motivation to put the 13 together? The 7 had been put together, but you're adding an additional 6 to be sure each of the individual 6 were known to prior art, but why was it obvious to combine those 6 with the pre-existing 7? And Peña provides the answer to that, because Peña itself identifies the same exact serotypes, those 13 serotypes that are identified in Claim 18, and says that they're in an advanced stage of study of coming up with a conjugate vaccine with those 13 serotypes. And Peña tells you as well, and so I turn to page 988 of the appendix for Peña. Peña tells you on page 988 that the 7 serotype vaccine used CRIM-197 as the protein. Peña then on page 995 tells you that the 9 serotypes, we're adding 2 more serotypes, 2 more polysaccharides, is also conjugated to CRIM-197. Then you go to page 901 of the record, which is Chiron, and Chiron tells you again that CRIM-197 is particularly preferred as the protein. So now you have the 7-valent, the 9-valent using CRIM-197, the polysaccharides are set up. The difference is, let me see if I understand. Peña, the board concluded it might mention these 13 serotypes, but there's no indication that the formulation was going to be successful or even considered. And then you're trying to lump that with Chiron, and Chiron doesn't disclose these 6 additional conjugates, right? Right. So Peña itself gives you all 13 serotypes. And the question is, do you conjugate them all to CRIM-197? I think is maybe what the board is doing. If we just turn to the board's decision on page 44, that would probably help unpack it. I don't think that you can get the 13 except from that aspect of Peña that says that this combining the 13 is being studied. Yes, and it says advanced stages of study. And the question is whether that's sufficient to provide a motivation to combine it. And it would. It should be sufficient. Because one, Peña itself tells you that you have the 13, you're studying it, and they're studying it because it's going to become a vaccine. Peña tells you that you're using CRIM-197 for the protein for 7-valent and 9-valent. Chiron says it's particularly preferred. And then Obara and Overturf tell you that, and Overturf is on page 1232, that the 11-valent version and the 9-valent version are using CRIM-197. And so if you're trying to figure out what am I going to do, what conjugate am I going to use if I'm going to 13, we know the conjugate for CRIM-197 worked for 7, it worked for 9, it worked for 11, it's particularly preferred according to Chiron, why isn't it obvious to use that same conjugate again? That's the point. I mean, I think that you're right that it might have been obvious to use the conjugate. But, you know, why put these 13 together? Oh, why the particular serotypes? Yeah. Yes. So Peña tells you why you would use those serotypes. And that is because you're trying to map, and I'll just turn to Peña on page 992, I believe. And Peña tells you, maybe 993. Which volume is that? It says, page 993, is the second column. Volume 1. Pardon? Volume 1. Volume 1, second column. It's the last full, very long paragraph, but right a little in the middle. It says, they're incorporating new serotypes to the 7-valent conjugate vaccine. And it tells you the conjugates are being added, 1 and 5, 3 and 7, 6A and 19A. Those are the ones listed in Claim 18. And it tells you why. This will broaden the spectrum of ages and countries, although we will continue to have much diversity in coverage. These are the serotypes you're going to use because you want to conjugate because you want to reach children who don't respond to the unconjugated version. You want to reach old people who do not respond as well to the unconjugated version. And you're going to add the most common serotypes. And Peña tells you the exact serotypes. They're in Claim 18. And those are the serotypes you want to do to maximize your coverage of ages and countries. Since Peña itself tells you that those are the serotypes being studied, it seems to me the incentive to study and the ones to actually do is apparent. It actually discloses those 13 serotypes. And so, in terms of whether or not there's a motivation to do it, another point that's critical. Just because somebody else is studying them doesn't mean that it would be a motivation to do it, does it? Well, it certainly is if you're trying to maximize your coverage and you're going to go for the 18 most common serotypes that cause most of the disease. These are the ones you're going to pick in line. And Peña tells you to pick those 13. And if you're looking for all the other places, it goes on. One of the key things about this invention, if you look at Claim 1 and Claim 17-18, it doesn't expressly require that it be effective as a vaccine. So it's enough to want to make it in the lab to study it, as Peña was doing there, making it in the lab to study it. And once you're making it in the lab to study it, then you're going to have to stabilize it against a silicone-induced aggregation. Because as the board explained on pages 23-25 of this opinion, silicone is ubiquitous in labs. It's in beakers, it's in stoppers. If you're doing animal studies, it's going to be in the syringes. So in the patent itself, if you look at page 307, column 14, about five lines down, it actually touts the patent's utility in the lab. The patent itself says, again this is page 307, back and forth, column 14, and it says, The novel formulations are particularly advantageous in that they stabilize and inhibit precipitation of immunogenic formulations comprised in the containerized means throughout the various stages of research, processing, development. Did you have an expert who said it would be a motivation to produce the 13-valent version? Did you have experts, or an expert, who said it would have been obvious to use the 13-valent combination? Yes, I think our experts did say that you were going to do the same 13 serotypes because they are the most common serotypes, and those are the serotypes that are listed. Where do we find that? I'm going to have to come back to you on that because I don't know the exact citation where our experts would talk about it. Those 13 serotypes are the most common, and it's hard for anyone to say that you're not going to do these very common serotypes because Payne itself tells you why it's important. Let me ask you, look at the board's analysis. I know we cut you off when you were trying to point us to page 44 or something, but look at appendix 83, which is where the board uses your evidence. And it says, you had a declarant which provided evidence that the 13 serotypes recited were known in the art. And it goes on to say, but you have not established persuasively or even explained in any specific way that the prior art or the knowledge, blah, blah, motivated the artisan to further modify provenance. What's wrong with that? So it says, modify provenance to include the 13 conjugates with reasonable expectation of successfully doing so. So why do you go from 7 to 13 conjugates? The same exact reason Payne tells you to do it, because it expands you to reach children and elderly people who are not going to respond to the unconjugated version. And what's wrong with the expectation of successfully doing so? The board doesn't tell you why it wouldn't be expected to be successful. Well, where's your expert testimony in the appendix that said that it would? It says, pardon? Did you have expert testimony? Yes, our expert says specifically that there was no reason to think that this would not work. That just as it worked for 7 and 9 and 11, it's going to work for 13. And for example, paragraph 45 on page 697, the expert goes through and says, everybody skilled in the art knows that the 7-valent version combined with 697 is working. So this testimony is at 697? 697, correct. Paragraph 45. And in fact, I don't think it's possible for the board to be saying, gee, no one could have thought that PRIM 197 was going to be used for this. Because the board refused to consider an Irish EPA document. And it said that's merely cumulative. But even though you try to avoid talking about this national progression argument on appeal, that was the argument you presented to the board. So the board looks at this, okay, you're assuming there's a natural progression. And they said, no, no, no, that's not good enough under our analysis of prior art, KSR. So I think that the phrase natural progression is just another way of saying it's obvious. Because if you have a set of solutions like conjugating PRIM 197 that works for your 7-valent version, and it works for your 9-valent version, and it works for your 11-valent version, and PRIM 197 is defined as particularly preferred, then it's obvious that it's going to be a candidate for the 13-valent version as well. I think that's just an application, standard application of KSR. It's not, whether you call it natural progression or the same solution, PRIM 197 worked for all the other versions. It's an obvious candidate for the 13-valent version as well. But the board rejected that at 83. And they cited kinetic, and they said that the way to avoid hindsight reasoning is to really have an explanation of how or why the recited references do what they do. And so they rejected that theory as not being enough. I'm not sure, when I read that, I think what the board might be asking for is to have in a single reference PRIM 197 together with the 13 serotypes, which I believe Pena actually provides properly read because it talks about adding additional serotypes to the existing 7. I think it would be helpful, maybe on your rebuttal, for you to identify for us where your expert said specifically that it would have been obvious to choose these 13 and put them together. Because I don't see that on 697. Okay, I will have that for you on rebuttal. But I think the short answer is that we didn't understand the board to be saying, hey, those 13 known serotypes weren't obvious candidates because Pena itself tells you that they are obvious candidates because it says these are the 13 serotypes. It sets out the 13 serotypes in Pena itself, gives you the progression from 7 to 9 to 11, tells you the exact serotypes of the 13. And the board says, hey, we know Pena tells you you're going to have to get those. Because what you need, I think, under those circumstances, I mean, Pena helps you. But what you need is some expert testimony from somebody who says, I read Pena, I'm familiar with it all. This would have told me and given me a motivation to put the 13 together and to select those 13. But so far, I don't see that. Okay, so turning to page 698. It says, claim 18, it has the 13 conjugates of Prevnar 13. As of April 2006, a poster would have found it obvious to select the 13 conjugates recited in Pena 2004. Each conjugated CRIM 197 for a polysaccharide protein conjugate vaccine. And it says, I understand they may not be the patenotomy claim, they're not obvious because they're conjugated to the same carrier protein. But the specific serotypes chosen in Pena are there. Pena says, here is the serotypes we're testing. And you're going to pick those serotypes for the reasons Pena gives. And you're going to choose those because that's how you expand coverage. If you look, there's a list of serotypes. You know how common they are. And you keep going to the next most common for the geographic regions at issue. It's not, I did not understand the board to be saying, oh, gee, who would have known to follow Pena for the choice of serotypes when Pena gives you the serotypes? The only thing I thought the board might. You're well into your rebuttal. I apologize. Thank you. All right. Thank you. May it please the court. The board's decision upholding claim 18 should be affirmed. At page 42 of the blue brief, Mark says that you, quote, never suggested that merely combining the claim conjugates with the stabilizing formulation as siliconized containers beyond the artisan's skill.  If so, why? Yes, Your Honor. It is beyond the artisan's skill.  Thank you. What tells us that in the record, Your Honor, is that the 13 valent conjugate that's described in claim 18 is nowhere described in the prior art. While the seven serotypes recited in claim 18 are set forth in the Pena reference, those seven serotypes are not shown or suggested anywhere in the prior art to be conjugated to the crim carrier protein. You heard Mr. Lampkin this morning, and he's talking about the disclosure in Pena. Why isn't that sufficient at least as an obviousness to try theory? It's not sufficient, Your Honor, because, well, first, Pena describes those vaccines as advanced phases of study and not yet molecular. And as the board found, that information alone is not sufficient to see whether those vaccines were even tried, considered, or successful. And given the fact that the prior art was showing that there was a trend towards using multiple carrier proteins rather than a single carrier protein like claim 18 specifies, there would be no reason to try this because the prior art was trending towards multiple carrier proteins. Did you have an expert testify to that? We certainly did, Your Honor. Our expert, Dr. Fatone, testified about this at length in the record. And this is at... Appendix 689, beginning at Appendix 689, paragraphs 19, 21, and 22 of Dr. Fatone's testimony. I don't understand that to be the basis for the board's decision. Are you agreeing that it would have been obvious to select the 13 then, but that what's non-obvious about this is the way, is the method of producing it? My understanding of the board's decision, Your Honor, is that the board found that Merck failed to show a motivation to combine the 13 valent conjugates or to modify the prior art to yield the 13 valent conjugate formulation of claim 18. And because Merck failed to show that... Let me interrupt you for a second. 689? 6089. Oh, okay. Sorry. In the second volume. Apologies. Thank you. To respond to, Your Honor, the board found that Merck failed to show any teaching or suggestion of a formulation comprising the 13 polysaccharide protein conjugates in claim 18. And based on Merck's failure to make that showing, the board found that there was no motivation to get to the claim subject matter. But to try to be clear about this, are you agreeing with Mr. Lampkin that it would have been obvious to choose the 13 to produce the vaccine? Absolutely not, Your Honor. So, there was, as early as 1983, there was Pneumovax, which is a free polysaccharide vaccine that had 23 serotypes. This was a free polysaccharide. So, it had all but one of the serotypes that are recited in claim 18. People, there were a wide variety of serotypes to choose from. The fact is that from 1983, it took 17 years to get the first conjugate vaccine. Well, did you have an expert who said it wouldn't have been obvious to choose the 13? I believe we did, Your Honor. We have our expert, again, Dr. Fatome. What he said wouldn't be obvious would be to choose the 13 and conjugate them to the crim carrier protein. That's different. Did he say it wouldn't have been obvious to choose the 13? I would— Sorry, Your Honor. Your Honor, our expert, Dr. Fatome, testified at page 6087 of the appendix. 6087. In paragraph 16 of his testimony. That the 23-valent vaccine was existing in the prior art. And that it would not have been obvious to conjugate these serotypes, additional serotypes, in vaccines of higher valency to crim, for the reasons that I stated, that these vaccines with conjugated— I'm seeing where he's focusing on that it would not be obvious to combine the 13. Okay. I apologize, Your Honor. I believe our expert testified that the problem here was the selection of serotypes and the conjugation to the carrier protein, crim. The pane of your reference does identify a 7-valent vaccine conjugated to the crim carrier protein. What about your paragraph 14? Page 6. I mean, that's as close as I think you get. Okay. Again, it looks as though he's saying it wouldn't have been obvious to conjugate it using this particular protein. I believe that's correct, Your Honor. But that was the problem that the board identified. That Merck, in its petition, never showed— while it showed, for example, with respect to Claim 17, Merck found, the board found, at appendix page 39 of the decision, that unlike the 7-valent conjugate of Claim 17, petitioner has not demonstrated that Chiron teaches or suggests incorporating a 13-valent conjugate into its formulation. And the board looked at Claim 17 and saw in Chiron an express reference to streptococcus pneumoniae and then an express citation of a reference which is called the Rubin reference, which identified with specificity the 7-valent vaccine, but the Rubin reference did not identify the 13-valent vaccine. In fact, no reference in this record shows the 13-valent vaccine conjugate where all 13 serotypes are conjugated to CRIM. Merck relies on, in the natural progression argument, they rely on a 9-valent vaccine which was conjugated to CRIM. That vaccine was in a lyophilized formulation. It was not in aqueous buffer formulation as required by the claim. Merck also relies on an 11-valent vaccine. There's no showing in the prior art of studies regarding the 11-valent vaccine, no showing of efficacy regarding that 11-valent vaccine. And moreover, there's showing that Sanofi, for example, its 11-valent vaccine used a multiple carrier approach. The fact is that the prior art was trending towards a multiple carrier approach. Sanofi studied single carrier protein vaccines in 2002 and came to the conclusion that a mixed carrier would be required. That's in appendix 52-14. GSK tried to make an 11-valent vaccine and with a single carrier called protein D. They found that vaccine to be lacking efficacy for certain otitis media episodes for serotype 3. GSK ultimately switched that single carrier protein to a multiple carrier protein. The fact is that there's no art in the record here showing that a 13-valent vaccine where all 13 serotypes are conjugated to CRIM was tried, considered successful, obvious, or anywhere in the art. And that was the basis for the board's decision that there was no motivation to combine and that there was a lack of reasonable expectation of success. Now, what happened in the invention, the development of the invention, Wyeth, the patent owner, was a maker of Prevnar 7, which comes up in the record. Prevnar 7, when Wyeth was developing the 13-valent vaccine, which is the subject matter of Claim 18, they tested Prevnar 7 and they saw that Prevnar 7 did not aggregate. They were surprised when they put lots of the 13-valent vaccine into siliconized containers, they saw aggregation. And that's what the invention is meant to solve. The inventors found that when they formulated the vaccine with aluminum in a buffer, as described in the claim, as described in Claim 18, that they did not get aggregation. If it was obvious to do Claim 17 and to conjugate it with this particular protein, why is it not obvious in Claim 18 to add the additional six? Because adding the additional, adding six additional serotypes to a vaccine in this field is not a simple matter, Your Honor. This is an unpredictable field here. The 7-valent vaccine was approved in 2000. The 13-valent vaccine did not get approved until 2010. When one adds serotype conjugates to these vaccines, a lot can happen in terms of the phenomena called immune interference and carrier-induced epidemic suppression. When you add additional conjugates to a vaccine, you're adding additional antigens, you're adding additional carrier protein. When you add additional carrier protein and you give those vaccines to subjects, that additional carrier protein will elicit an immune response in those subjects, often overpowering the immune response of the serotypes. Did your expert say that? Yes, Your Honor. Our expert said that. Again, this is Dr. Fatone who testified about this, Your Honor. Dr. Fatone testified this at... Apologies. 26. In his declaration at 6090, for example, in paragraph 22, the recommendation to use a mixed carrier approach for the 8-valent vaccine was a common approach. As discussed below, there was a concern that increasing amount of carrier protein in multivalent vaccines could induce carrier-induced epidemic suppression for some of the serotypes. He goes on to discuss this at length in paragraphs 24 through the end of his declaration. He was saying that 17 was also not obvious, right? I don't think Dr. Fatone was specifically opining on claim 17, Your Honor. I believe Dr. Fatone was discussing the theory, not the theory, the fact that adding additional serotypes to a vaccine, adding additional conjugates to vaccines cause immune interference and cause induced by carrier-induced epidemic suppression. In paragraph 22, he's talking about the 8-conjugate vaccine. I think you want paragraph 26, but I'm just guessing. Paragraph... That's talking about the 13 as Judge Wallop points out, which is what the discussion here is about. Paragraph 26 is talking about immune interference when developing the 13-valent conjugate. Thank you, Your Honor. Paragraph 22, just to help, just to clear that problem I raised. Paragraph 22 is the instance that I discussed earlier. Dr. Fatone found, Dr. Fatone was discussing Sanofi's efforts to develop 8-valent vaccines. And they found, because of immune interference, that a multiple carrier approach would be the optimal approach for developing these vaccines once you were increasing valency above the Prevnar 7-valent vaccine. Can I just point... Appendix 86 is where the board, I think, you can point me to something else if you think, but they seem to reject reliance of Pena by saying all Pena says is these 13 conjugates. This is an advanced phase of study. But it seemed like all the board relied on was we can't assess whether the study was ever considered, if such an attempt was even considered, tried, and successful. Can you just talk to me a little about that? I mean, if Pena does talk about this being an advanced phase of study, why isn't that sufficient to establish motivation? They didn't have to show that it was successful, right? Is that what's required by the law? The board pointed out that Pena failed to show the additional serotypes conjugated to CRIM. And it saw in Pena no discussion of any data at all related to those advanced, related to even the 9 and 11-valent vaccines that are described in Pena. So one skilled in the art would not know whether those vaccines would be efficacious or work. And it simply would not be, given what was going on in the prior art with the trend toward mixed carrier approaches, one skilled in the art would not be motivated to apply CRIM to the additional serotypes. Well, the board says was even considered, tried, and successful. Is that what's necessary to establish a motivation to combine that the study in Pena would have been successful using the 13-conjugate vaccine? This is a very unpredictable field, and I think the board recognized that, Your Honor. And that's why they, in finding CLAIM-17 obvious, they were able to find that motivation because they saw an explicit reference in the prior art to the 7-valent vaccine of CLAIM-18 that was linked to Chiron, the primary reference. But we need a reasonable expectation of success, not a demonstration in the prior art that it was successful, right? That's fair, Your Honor. But I believe that there is no reasonable expectation of success in April of 2006. Well, I mean, you believe it. I mean, that doesn't help us. I misspoke. The evidence and the witnesses, our witnesses, testified that there was no reasonable expectation of success in April of 2006 to generate a 13-valent vaccine recited in CLAIM-18 where all of the carrier protein was the CRIM carrier protein. We're way beyond your time.  Thank you, Your Honor. Three minutes. Thank you, Your Honor. I think a lot of the discussion shows that, frankly, it's not at all clear what the board's rationale was here. Some of us have been talking about whether or not the choice of the particular 13 serotypes that are expressly disclosed in Pena was obvious, but Pena discloses them. And if the court wants to know why they were done, I would direct the court to Hausdorff on page 1219, which talks about the frequency of running into those particular pneumonia serotypes. I think your problem is that the board didn't cite to some materials that were raised by Wyeth's expert, but there's plenty there to support what they did. So if the board met Cs, and I think there's a lot of discussion about that, or the assertion that, in theory, if you put too many serotypes on a particular protein, it will have immune interference. But that cannot be what the board met, and it can't be what the board met for three reasons. The first is the board didn't address the Irish EPA document. It said we're not going to look at the Irish EPA document because it's cumulative or we just have another ground. But the Irish EPA document, and our expert talks about it on page 697 and 698 of the record, the Irish EPA document showed that Merck itself was using a single carrier protein, CRIM, for its 7, 9, 11, and 13 valent versions. So it can't be that there's no evidence that you can use it without Cs, and yet we won't consider the document that actually shows it's being used. The second reason is this. Wyeth itself admits on page 57 of their brief that the board, and I'm quoting, did not reach Wyeth's arguments regarding immune interference. If there's one thing clear from administrative law generally, it is that the court can't affirm on the basis of an argument or a theory or fact findings the board never made. If the board were going to go off on a Cs theory that somehow people are deterred from doing 13 because of immune interference, it would have had to address the admission from Wyeth's own expert who said, let me say this, Cs is not something that will prevent you from developing any vaccine with any valency. It's a risk management and risk evaluation. The patent nowhere suggests the innovation of somehow overcoming Cs. Nowhere in the patent does it say that. And finally, Rubin, which is one of the references that the board considered on page 1889, talks about increasing valencies. On page 1889 it says, look, going from 7 to 9 to 11, you haven't seen immune interference. Why does it suddenly become not even obvious as a candidate, something obvious to do in the lab when you're just going from 11 to 13? There's another reason why Cs can't be the answer, and that's because the board repeatedly found in the patent itself, the claims themselves make clear that you don't have to have any particular level of immunogenicity in these claims. So if you're having some decree or it doesn't even have to be effective as a vaccine, the notion that you're going to be deterred from even trying it out when there's no particular level of immunogenicity required from the claims is pretty hard to square. When the board repeatedly says no required degree of immunogenicity, you're at least going to want to test it. At least you're going to want to try it. And it's the obvious one because the serotypes are set out in SENA and CRIM-197 is the one that keeps working in the past. It's yours for 7, 9, 11, and it's particularly preferred under CHI-ROT. Look, Wyeth has other patents that cover the composition, an immunological version of it that says we have a vaccine, it has these 13 serotypes, and it works. They can't strip out the requirement of it having an immune effect, add an obvious stabilizing formula, and then try and extend the duration of those patents by another year. The stabilization formula that's the focus of the patents was held obvious and it's not challenged before this court. 13 valence, the particular 13 valence are sitting there in the prior and Peña and conjugated into the CRIM-197 is obvious as well because that's the one that everyone works and goes to. And if the court looks to 1232 in particular, it says Wyeth itself is using CRIM-197 for its 9 valence version and its 11 valence version. If there's some magic reason why that combination, Peña's 13 serotypes and CRIM-197 isn't going to work, even though it worked for the first 7, the next 2, the next 2 up to 11 serotypes, some magic reason it's not going to work or it's not obvious to try it out. The board's going to have to tell us why, but it doesn't. And I think it doesn't because it made a mistake of obviousness law. It asked whether or not it found the actual combination in the prior art, CRIM-197, together with those 13 serotypes. The question is, is it obvious to put them together? And when you look at 7, 9, 11, particularly preferred CRIM-197 and Chiron, it is at least obvious to try that out in the lab. If there are no further questions, we ask the court to reverse. We thank both sides and the case is submitted. The next case for argument is 18-2261, Shilamo Isano v. United States.